**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CHATTAHOOCHEE RIVERKEEPER, INC., | |
| Plaintiff, | |
| v. | Civil Action File No. 1:24-cv-03989-SDG |
| CITY OF ATLANTA, GEORGIA | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT CITY OF ATLANTA, GEORGIA'S
MOTION TO DISMISS IN PART AND MOTION TO STAY IN PART**

Defendant City of Atlanta, Georgia ("the City") files this memorandum of law in support of its Motion to Dismiss in Part and Motion to Stay in Part Plaintiff Chattahoochee Riverkeeper, Inc.'s ("CRK") Complaint [Dkt. 1] for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

The City operates three wastewater treatment facilities that provide services to residents of Atlanta, College Park, East Point, Hapeville, Fulton County, and DeKalb County. The operations are overseen by the Georgia Environmental Protection Division ("EPD") through a robust permitting process and stringent permit requirements. Starting in March 2023, the City experienced a series of illegal third-party discharges into the sewer system that created operational issues at the wastewater treatment facilities and, in turn, led to exceedances of seven parameters identified in the permit that governs operations of those facilities. In accordance with the terms of that permit, the City immediately reported those discharges and has worked with EPD since then to bring the facilities back into compliance. Indeed, by the date the Complaint was filed, the City had achieved sustained compliance with five of the seven parameters and is working to achieve compliance with the remaining two. In addition, EPD has been actively and diligently pursuing enforcement action with respect to the exceedances. In May 2024, the City and EPD

executed a consent order that addressed exceedances from July 2022 to June 2023. The City and EPD are currently negotiating a second consent order that will address exceedances after July 2023.

Because the City achieved compliance with five of the seven parameters before the Complaint was filed, CRK cannot assert Clean Water Act ("CWA") claims arising out of the City's alleged non-compliance with those parameters or related management requirements in the permit. As a result, CRK's claims related to those parameters should be dismissed as a matter of law. Once the City achieves compliance with the remaining parameters, CRK's claims arising out of alleged non-compliance with those parameters and related management requirements will be rendered moot. This Court should exercise its discretion to stay this action to allow EPD to finalize its enforcement action against the City and avoid the inefficiency of unnecessary and duplicative litigation that will ultimately be rendered moot.

## STATUTORY AND REGULATORY FRAMEWORK

The CWA prohibits the discharge of any pollutant into waters of the United States from a wastewater treatment facility, except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311. With the approval of the U.S. Environmental Protection Agency ("EPA"), state officials can assume primary responsibility for NPDES discharge permits. *See* 40 C.F.R. § 123.1. EPD has received approval from EPA to draft, issue, and enforce

NPDES permits in Georgia, subject to EPA's limited backstop authority.

In situations where EPA or the delegated state agency does not exercise enforcement powers, the CWA authorizes citizens to bring suits to enforce alleged violations of effluent limitations in NPDES permits. 33 U.S.C. § 1365. Citizen suits serve as a secondary enforcement mechanism and thus play a "limited role" in the overall CWA regime. *See Black Warrior Riverkeeper, Inc. v. Black Warrior Mins., Inc.*, 734 F.3d 1297, 1298 (11th Cir. 2013). These suits are appropriate only to "abate an ongoing violation." *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59-60 (1987) (noting that Congress intended for citizen suits "to supplement rather than to supplant government action").

Before initiating a CWA citizen suit, a plaintiff must provide a detailed notice to the allegedly offending party, as well as to the state and EPA. The notice must include sufficient detail to allow the recipients to identify the specific violation (*e.g.*, the permit limit allegedly exceeded); the activity alleged to constitute a violation; and the location and date of the alleged violation. *See* 40 C.F.R. § 135.3(a). This level of detail enables the alleged violator to comply with the law and minimizes the burden on agencies and courts. *See Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1329 (11th Cir. 2007).

## STANDARD OF REVIEW

Motions to dismiss pursuant to Rule 12(b)(1) are attacks on a plaintiff's

assertion of the Court's subject matter jurisdiction. *Morrison v. Amway Corp.,* 323 F.3d 920, 924 n.5 (11th Cir. 2003). A factual challenge disputes the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and even at the motion to dismiss stage, the Court may consider matters outside the complaint and weigh conflicting evidence to determine if jurisdiction is supported by the facts. *See Bothwell v. ExpressJet Airlines, LLC,* 2021 WL 7707778, at *3 (N.D. Ga. July 28, 2021), report and recommendation adopted, 2021 WL 7707775 (N.D. Ga. Sept. 1, 2021) (granting defendant's motion to dismiss for lack of subject matter jurisdiction after considering three affidavits attached to the defendant's motion).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a district court normally must look within the four corners of the complaint in ruling on a motion under Rule 12(b)(6), it may consider other documentation when it is central to the claims and is undisputed. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

**FACTUAL BACKGROUND**

The City "is a municipal corporation organized under the laws of the State of Georgia." (Compl. ¶ 25.) The City operates three wastewater treatment facilities serving citizens within its service area: the RM Clayton Water Reclamation Center ("RM Clayton"), the Utoy Creek Water Reclamation Center ("Utoy Creek"), and the

South River Water Reclamation Center ("South River").  (*Id.* ¶¶ 25, 48; Declaration of Joseph Porter, Jr. ("Porter Decl."), attached hereto as **Exhibit A**, at ¶ 3.)  CRK is an environmental organization focused on the Chattahoochee River.  (Compl. ¶ 19.)

I.    **The City's Wastewater Operations Are Subject to Permits Issued and Monitored by EPD.**

The City's wastewater operations are overseen by EPD through a robust permitting process and stringent permit requirements.  (Porter Decl. ¶ 4.)  The relationship between EPD and the City includes a lengthy history of periodic and recurring permit renewals.  In 2017, consistent with this history, EPD issued an NPDES permit to the City, Permit No. GA0039012, that governed discharges of treated effluent from all three wastewater treatment facilities to the Chattahoochee River (the "2017 Permit").  (Compl. ¶ 51; Porter Decl. ¶ 5, Ex. A.)  The permit was administratively extended through December 31, 2023, and in December 2023 EPD reissued the permit, which became effective January 1, 2024 (the "2024 Permit").  (Compl. ¶¶ 51–52; Porter Decl. ¶ 6, Ex. B.)  (When feasible, the permits are referred to collectively as the "Permit.")  EPD has been directly involved in monitoring and ensuring the City's compliance with the Permit.  (Porter Decl. ¶ 9.)

The Complaint alleges violations of numeric effluent limitations and narrative conditions in the Permit.  Two sets of effluent limitations are relevant.  First, there are combined effluent limitations for all three plants that include monthly and weekly average discharge limitations for three parameters at issue: Carbonaceous

Five-Day Biochemical Oxygen Demand ("BOD"), Ammonia, and Total Phosphorus. (Porter Decl. ¶ 7, Exs. A & B.) Second, there are effluent limitations that apply only to RM Clayton that include monthly and weekly average discharge limitations for five parameters at issue: Total Suspended Solids ("TSS"), Ammonia, Total Phosphorus, Chemical Oxygen Demand ("COD"), fecal coliform, and *E. Coli*. (*Id.*) CRK alleges that, at various times since January 2023, the discharge at RM Clayton exceeded the monthly and/or weekly limitations for these parameters. (Compl. ¶¶ 75-76.)[1] CRK also alleges that the City violated three narrative conditions at RM Clayton: one that requires proper maintenance and operation, another that imposes a duty to mitigate adverse impacts, and a third that imposes a duty to prevent injury to property or downstream users. (*Id.* ¶¶ 54-56.)

At all relevant times, the City has been in communication with EPD regarding Permit compliance issues, and EPD has taken appropriate action to oversee and ensure compliance with the Permit. (Porter Decl. ¶ 9.)

## II.     The Alleged Violations Are the Result of Illegal Third-Party Conduct and Uncontrollable Acts of Nature That Are Being Addressed Through Corrective Action Overseen by EPD.

The violations alleged in the Complaint are the result of certain operational issues that were triggered by three significant unauthorized high strength pollutant

---

[1] In 2022, EPD replaced the fecal coliform standards with *E. Coli* standards (Compl. ¶ 46) and thereafter revised the City's 2024 Permit accordingly. As a result, the fecal coliform limitations apply only to the 2017 Permit. (*Id.*)

loading events into the sewer system (referred to as "illicit discharges") in March and May of 2023 that were compounded by significant wet weather events in early 2024. (Porter Decl. ¶ 10, Ex. C (April 19, 2024 Letter at 2–3).) Prior to the illicit discharges, the City was in compliance with effluent limits. (Porter Decl. ¶ 11.) The illicit discharges disrupted the City's biological treatment system, resulting in exceedances of BOD, ammonia, and phosphorus. (*Id.* ¶ 12.) They also interrupted the normal operation of the secondary clarifiers, which led to exceedances of ammonia, *E. coli*, fecal coliform, TSS, and COD. (*Id.*)

The City timely notified EPD of these illicit discharges and resulting exceedances, and EPD began working with the City to mitigate the issues. (*Id.* ¶ 13.) On April 3, 2023, EPD conducted a Compliance Evaluation Inspection at RM Clayton, after which the City continued to communicate with EPD regarding the illicit discharges. (*Id.* ¶ 14.) On October 11, 2023, EPD proposed a Consent Order to the City to address all previously unresolved violations occurring within the City's system. (*Id.* ¶ 15.) However, extreme wet weather events in early 2024 resulted in additional exceedances. (*Id.*) As a result, on January 26, 2024, EPD transmitted a modified version of the proposed Consent Order to the City. (*Id.*)

Consistent with its active oversight role, EPD conducted an unannounced inspection of RM Clayton on March 7, 2024, after which it issued a Notice of Violation ("NOV") dated March 22, 2024. (Compl. ¶ 61; Porter Decl. ¶ 16, Ex. D.)

Despite EPD's well-documented involvement in overseeing and enforcing issues related to the City's wastewater treatment operations, CRK suggests that the NOV was the result of action taken by CRK. (Compl. ¶¶ 59-61.) CRK further alleges that the City did not begin repairs at RM Clayton until after CRK notified the City and the media regarding these issues. (*Id.* ¶ 62.) To the contrary, the NOV makes clear that EPD was aware of and actively involved in overseeing resolution of the issues at RM Clayton prior to any communications from CRK, that the City had undertaken repairs to address those issues, and that the City provided regular updates to EPD regarding its corrective and preventive efforts. (Porter Decl. ¶ 16, Ex. D (NOV).)

The NOV required the City to submit a corrective action plan ("CAP") comprised of ten elements, including defined corrective actions and associated implementation schedules to address equipment and operational failures; an update to the Standard Operating Procedure ("SOP") for Operations and Maintenance ("O&M") of equipment and for reporting noncompliance; and an outline of the steps that had already been taken to address the causes of equipment failures. (Porter Decl. ¶ 17, Ex. D (NOV).) EPD stated that it would review the CAP and "determine if further enforcement action, including monetary penalty, [was] warranted." (*Id.*)

On April 19, 2024, the City responded to the NOV and provided a CAP that addressed all ten elements. (Porter Decl. ¶ 18, Ex. C (April 19, 2024 Letter, Appendix A).) The City detailed corrective actions taken to date, including the use

of chlorine to assist in disinfecting plant effluent, the addition of eight mobile clarifiers to increase secondary clarifier treatment capacity, schedules for repairs to the primary and secondary clarifiers, and a priority list for repairs to equipment critical for the operation of the facility. (*Id.*)

On May 21, 2024, EPD and the City executed Consent Order No. EPD-WP-9522 to address exceedances at RM Clayton, South River, and Utoy Creek occurring from July 2022 to June 2023, specifically including the illegal third-party acts described above. (Porter Decl. ¶ 19, Ex. E (May 2024 Consent Order).) The May 2024 Consent Order required the City to pay penalties amounting to $163,056.81 for the violations listed in the Order. (Porter Decl. ¶ 20, Ex. E (May 2024 Consent Order at 5.) Additionally, the May 2024 Consent Order mandated that the City submit a status update on the illicit discharge plan, including actions to "mitigate impacts to the treatment facility, . . . conduct additional pretreatment facility inspections, add nutrients and bacteria to the treatment process to assist with operational functions of equipment, . . . and ensure procedures for staff to quickly perform a daily review of influent and effluent contaminant levels . . . ." (*Id.* at 3, 5.)

Thereafter, the City and EPD continued their regular communications regarding the issues experienced at RM Clayton. For example, on June 12, 2024, upon request from EPD, the City sent EPD an updated SOP for O&M for RM Clayton and confirmed that seven of the ten secondary clarifiers were operating as

designed. (Porter Decl. ¶ 21.)    On June 20, 2024, the City further detailed the corrective action plans in place.  (Porter Decl. ¶ 22, Ex. F (June 20, 2024 Letter.) On July 19, 2024, upon request from EPD, the City confirmed that all eight of the primary clarifiers had returned to operational status. (Porter Decl. ¶ 23.)

On August 8, 2024, EPD and EPA conducted an inspection of RM Clayton to assess the operational status and progress since the March 2024 inspection.  (Porter Decl. ¶ 24, Ex. G (August 30, 2024 Letter with Inspection Report).)  The August inspection confirmed that the corrective actions reported by the City in the July 19, 2024 email had been completed as indicated and that all eight primary clarifiers were operational.  (Porter Decl. ¶ 25, Ex. G.)  EPD concluded that, "[o]perations have improved since the March 2024 visit. Many secondary clarifiers have come back online, the drum screens have been put into operation, all primary clarifiers are operational, effective disinfection has improved, and the appearance of the effluent has improved."  (*Id*.)  On October 7, 2024, the City responded in writing to the August 8, 2024 Inspection Report and noted that the City had accomplished most of the corrective actions despite experiencing severe weather conditions, including flooding and high winds, on September 25 and 26, 2024, due to Hurricane Helene. (Porter Decl. ¶ 26, Ex. H (October 7, 2024 Letter).)

The City is working diligently with EPD to address remaining issues and is currently negotiating a Consent Order to resolve permit violations occurring in July

2023 and after.  (Porter Decl. ¶ 27.)  As of March 2024, the City achieved compliance with the effluent limitations for BOD, which it has maintained to present.  (Porter Decl. ¶ 28.)  As of April 2024, the City achieved compliance with the effluent limitations for *E. coli* and COD, which it has maintained to present.[2]  (*Id.*)  As of August 2024, the City achieved compliance with the effluent limitations for TSS, which it has maintained to present, with the exception of a single exceedance that resulted from Hurricane Helene.  (Porter Decl. ¶ 29.)  The City is continuing to take steps to achieve compliance with the effluent limitations for ammonia and phosphorus.  (Porter Decl. ¶ 31.)

III.  **CRK's Citizen Suit Addresses the Same Alleged Violations That the City and EPD Have Been Working to Resolve Since March 2023.**

Notwithstanding the City's and EPD's active and continuing efforts to address permit compliance, on July 1, 2024, CRK sent a 60-day notice letter ("the Notice Letter") to the City asserting exceedances of the very effluent limitations being addressed by EPD, including COD, BOD, TSS, fecal coliform, *E. coli*, ammonia, and phosphorus.  *See* Notice Letter, [Dkt. 1-1].  CRK also asserted that the City failed to properly operate and maintain RM Clayton; however, notably, the Notice Letter did not address any violations of the narrative conditions of the Permit.

---

[2] The Complaint alleges a single exceedance of fecal coliform in July 2023.  The City did not experience any other exceedances of fecal coliform between July 2023 and January 2024 (the date on which the current permit became effective, at which time fecal coliform was no longer included in the permit).  (Porter Decl. ¶ 30.)

**ARGUMENT AND CITATION OF AUTHORITY**

**I.      Count I Should Be Dismissed in Part and Stayed in Part for Lack of Subject Matter Jurisdiction and/or for Failure State a Claim.**

In Count I, Plaintiff asserts a CWA claim based on allegations that the City is violating the effluent limitations in its NPDES Permit for BOD, TSS, ammonia, phosphorus, COD, fecal coliform, and *E. coli*. (*See* Compl. ¶¶ 74-76.)  Because there are no ongoing permit violations with respect to BOD, TSS, COD, fecal coliform,[3] and *E. Coli* (the "Parameters in Compliance"), this Court lacks subject matter jurisdiction to hear CWA claims based on those parameters.  With respect to the remaining parameters (ammonia and phosphorus), EPD is taking enforcement action to address ongoing violations, and CRK's claims related to those parameters will be mooted by a forthcoming Consent Order executed by EPD and the City.  In the alternative, Count I is also subject to dismissal because EPD is diligently prosecuting the alleged violations; as a result, CRK has failed to state a claim.

**A.      Because There Are No Ongoing Violations of the Parameters in Compliance, This Court Lacks Subject Matter Jurisdiction.**

CWA Citizen suits may only be brought for ongoing violations of an NPDES Permit, not wholly past violations.  *See Gwaltney*, 484 U.S. at 57 ("[C]itizens, unlike the Administrator, may seek civil penalties only in a suit brought to enjoin or

---

[3] Because fecal coliform is not included in the permit effective January 2024, it cannot form the basis of a continuing violation.

otherwise abate an ongoing violation."); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F. 2d 1128, 1133 (11th Cir. 1990) ("[T]his Court recognizes that the Supreme Court of the United States has held that citizen suits are not permitted for wholly past violations of the CWA."). Intermittent or sporadic violations are not considered "ongoing" when there is no real likelihood of repetition. *See City of Mt. Park, LLC v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288, 1292 (N.D. Ga. 2008).

Count I is based in part on alleged violations of the effluent limitations for BOD, COD, TSS, fecal coliform, and *E. Coli*. However, the City achieved compliance with effluent limitations for BOD, COD, TSS, and *E. Coli* before this action was filed on September 6, 2024, and the fecal coliform limitation was removed from the 2024 Permit long before this action was filed. Specifically, the City has been in continuous compliance with its weekly *E. coli* limitations since March 30, 2024 and its monthly limitations since April 2024. (Porter Decl. ¶ 28.) Likewise, the City has been in continuous compliance with it weekly TSS limitations since March 30, 2024 and its monthly limitations since May 2024. (*Id.*) The City has also been in continuous compliance with its weekly TSS limitations since July 27, 2024 and its monthly TSS limitations since August 2024.[4] (*Id.*) Finally, the City

---

[4] The City experienced a one-time exceedance of its TSS limitation during the week of September, 28 2024 due to Hurricane Helene. (Porter Decl. ¶ 32.) That exceedance is the result of an act of nature and cannot be used to establish an ongoing violation or a reasonable risk of future violations. *See Sierra Club of Mississippi, Inc. v. City of Jackson, MS*, 136 F. Supp. 2d 620, 629. Moreover, to the extent a

has been in continuous compliance with its weekly BOD limitations since March 16, 2024 and its monthly BOD limitations since August 2023. (*Id.*)

Moreover, there is no reasonable risk of recurring violations with respect to the Parameters in Compliance. According to CRK, the unlawful discharges resulting from the alleged permit violations were "caused" by the operational and maintenance issues alleged in the Complaint. (Compl. ¶ 3.) However, prior to CRK's lawsuit, the City addressed the alleged operational and maintenance issues. For example, CRK alleges that the Facility's eight primary clarifiers were not operational on June 17, 2024. (Compl. ¶ 64.) The main purpose of a primary clarifier is to separate suspended solids, oil, and grease from wastewater, which is one of the first steps in the wastewater treatment process. Having operational primary clarifiers leads to reduced levels of TSS, BOD, *E. Coli*, and COD. (Porter Decl. ¶ 23.) As of July 19, 2024 (and as confirmed by EPA and EPD), all eight of the primary clarifiers had returned to operational status. (Porter Decl. ¶ 23.)

In August 2024, EPD and EPA confirmed that the operation and maintenance at RM Clayton had improved, with most of the secondary clarifiers back online, drum screens back in operation, all primary clarifiers operational, and effective improvements in disinfection and the appearance of the effluent. (Porter Decl. ¶ 25.)

---

claim based on TSS is permitted to proceed notwithstanding that there are no ongoing violations, the City will be entitled to the upset affirmative defense for this exceedance. *See* 40 C.F.R. §§ 122.41(n)(3), 122.41(d).

The City also installed sensors in the collection system as part of a six-month Organic Loading Pilot Study to monitor influent conditions coming from the three influent trunk sewers to RM Clayton in order to identify irregular spikes in organic load or other illicit discharges and take timely action. (*Id.*)

Because there are no ongoing violations of the Parameters in Compliance, the Court lacks subject matter jurisdiction to address allegations in Count I related to these parameters. Therefore, Count I should be dismissed in part accordingly.[5]

### B.    The Court Should Stay Resolution of the Remainder of Count I Because of EPD's Ongoing Enforcement Action.

The remainder of Count I relates to alleged exceedances of ammonia and phosphorus that the City has been working with EPD to address. (Porter Decl. ¶ 31.) The City and EPD are currently negotiating the terms of a second Consent Order that will address exceedances on and after July 2023 and will include penalties. (*Id.* ¶ 27.) Once the Consent Order is in place, CRK's claims will be moot. For the sake of judicial efficiency, the City respectfully requests that the Court stay resolution of the case until EPD's enforcement action is complete.

---

[5] To the extent there is any doubt regarding potential future violations of the Parameters in Compliance, allegations based on those parameters are also subject to dismissal based on action taken by EPD to enforce the Permit. As described more fully below, EPD and the City are negotiating a Consent Decree that will address the Parameters in Compliance, as well as ammonia and phosphorus. Once finalized, that Consent Decree will render Count I moot in its entirety; in the alternative, the claims will be barred by the doctrine of diligent prosecution.

### 1. Once the Consent Order Is Finalized, Count I Will Be Rendered Moot in its Entirety.

"An issue is moot 'when it no longer presents a live controversy with respect to which the court can give meaningful relief.'" *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009); *see Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 637 F. Supp. 2d 983, 986–87 (N.D. Ala. 2009). Mootness is jurisdictional, requiring dismissal because any decision on a moot issue would constitute an impermissible advisory opinion. *Sierra Club v. U.S. E.P.A.*, 315 F.3d 1295, 1299 (11th Cir. 2002).

A citizen suit can become moot even if the allegedly violative conduct ends post-filing. As a general rule, "[w]hen events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief, the case is moot and must be dismissed." *Cherokee Mining, LLC*, 637 F. Supp. 2d at 987. In cases of involuntary mootness, federal courts apply a less stringent standard to determine whether agency action moots a citizen suit. *See id.* at 987-8 (distinguishing the standard applied when defendant voluntarily ceased CWA violations from the less stringent standard applied when the defendant's actions were taken in response to an order entered by a state agency). So long as the agency order adequately addresses the violations alleged in the Complaint and there is no clear basis to infer that the City will continue to engage in prohibited conduct, then CRK's claims are moot. *Id.* at 990.

16

The City has already achieved compliance with five of the seven parameters identified in CRK's complaint and is actively taking steps to achieve compliance with the effluent limitations for ammonia and phosphorus.  As a result, CRK's request for injunctive relief regarding individual violations of at least five of the parameters alleged by CRK has already been rendered moot, and CRK's request for injunctive relief regarding individual violations of the remaining two parameters alleged by CRK will be rendered moot once the City and EPD finalize and execute the draft Consent Order currently being negotiated.

Moreover, CRK's request for civil penalties should also be barred on the grounds that the City's action to achieve permit compliance was done in response to EPD's enforcement activities, rather than in reaction to the instant lawsuit.  Like in *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 637 F.Supp.2d at 987, the City's actions "were in direct response to an order entered by the state agency officially charged with the responsibility for dealing with water violations."  *Id*. Here, EPD's enforcement activities, which will be memorialized with a Consent Order mandating penalties, address the same remedies and operative facts as CRK's claims, rendering those claims moot.

### 2.    The Court Has Broad Discretion to Stay Proceedings.

"The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."  *See Danso v. Krauss Maffei Corp*., 2019 WL

5586574, at *1 (N.D. Ga. Aug. 6, 2019). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Id.* A stay of proceedings is warranted when it would further judicial economy or efficiency and cause no prejudice to any party. *See Dise v. Express Marine, Inc.*, 2008 WL 2163920, at *4 (S.D. Ala. May 19, 2008) (granting motion to stay pending outcome of related proceedings where, "[i]n the absence of a stay, scarce judicial and litigant resources w[ould] be expended" on litigating a dispute that had the potential of being rendered moot, in which case "the time and efforts of the parties and th[e] Court in the[] proceedings w[ould] have been wasted" while "no demonstrable, material prejudice" would be worked upon any party by granting a temporary stay).

Under appropriate circumstances, a court can stay a citizen suit pending the resolution of administrative proceedings. *See Black Warrior Riverkeeper, Inc. v. Birmingham Airport Auth.*, 561 F. Supp. 2d 1250, 1252, 1255 (N.D. Ala. 2008) (staying a CWA citizen suit pending resolution of the administrative proceedings); *see also Centreville Citizens for Change v. City of Cahokia Heights*, 2024 WL 69085, at *4 (S.D. Ill. Jan. 5, 2024) (staying CWA citizen suit where environmental agencies "ha[d] been working with [defendant] to address the sanitary sewer

18

overflows at issue in Plaintiffs' complaint for years, and . . . some, if not all, of the injunctive relief in Plaintiffs' complaint may be resolved by those ongoing efforts.")

Here, EPD has commenced and is diligently pursuing enforcement against the City in the form of the proposed Consent Order. The City is actively negotiating the terms of settlement with EPD that will address the issues identified in the Complaint, including the issuance of penalties for violations and the implementation of corrective actions to prevent further violations. Once EPD finalizes the Consent Order, all of the claims in this case will be rendered moot. Further, the Consent Order will be available for public comment before it can become final. *See* Ga. Comp. R. & Regs. 391-1-3-.01(2)(a)(3). During the public comment period, CRK will have an opportunity to provide input regarding the terms of the Consent Order using the administrative process available under Georgia law. *See id*. In view of this opportunity to participate directly, there is no reason to maintain this redundant lawsuit. At the very least, judicial economy and efficiency, as well as the costs to the parties and the Court, suggest that this matter should be stayed for a limited time while the administrative proceeding is completed, which could, at minimum, narrow the claims in this suit. *See Smith v. GTE Corp*., 236 F.3d 1292, 1298 n.3 (11th Cir. 2001) ("[A] court of competent jurisdiction may dismiss or stay an action pending a resolution of some portion of the actions by an administrative agency.")

**C.    In the Alternative, Count I Is Subject to Dismissal Because of EPD's Diligent Prosecution.**

CWA citizen suits are intended to "supplement rather than to supplant" governmental action and are appropriate only when government agencies fail to exercise their enforcement responsibility.  *Gwaltney,* 484 U.S. at 60.  The CWA bars a citizen from seeking to enforce the CWA when the "State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under [the CWA] or such comparable State law."  33 U.S.C. § 1319(g)(6)(A)(iii).

Here, CRK seeks to enforce the CWA with respect to alleged violations that began in January 2023.  (Compl. ¶¶ 75-76.)  However, on May 21, 2024, EPD and the City executed the May 2024 Consent Order addressing violations from July 2022 to June 2023, including certain of the exceedances alleged in the Complaint. (Porter Decl. ¶ 19, Ex. E (May 2024 Consent Order).)  Moreover, the City was required to pay penalties in the amount of $163,056.81. (*Id*. at 6.)  EPD has diligently prosecuted all exceedances of the alleged limitations that occurred prior to June 2023; as a result, they cannot not be the subject of this citizen suit.  Further, the City and EPD are negotiating a second Consent Order that will address violations occurring on and after July 2023, and that forthcoming Consent Order will include penalties.  As a result, they also cannot be the subject of this citizen suit.[6]

---

[6] There is non-binding authority that could be construed to nullify application of the diligent prosecution bar because Georgia law is not sufficiently comparable to

## II.    <u>Count II Should Be Dismissed for Lack of Subject Matter Jurisdiction.</u>

In Count II, CRK alleges that the City has violated the CWA by "fail[ing] to meet management requirements" at RM Clayton. (Compl. ¶ 85.) CRK cites three separate but overlapping narrative provisions in the Permit, all arising out of the operational issues that underpin the alleged effluent violations in Count I. First, CRK claims that the City is violating Part II.A.1, which requires "Proper Operation and Maintenance." (*Id.* ¶¶ 84-87.) Second, CRK claims that the City is violating Part II.A.10, which imposes a "Duty to Mitigate." (*Id.* ¶¶ 88-89.) Third, CRK claims that the City is violating Part II.A.11, which imposes a duty to prevent injury to property and downstream users. (*Id.* ¶¶ 90-93.)

Count II fails (or will fail) because the CWA does not authorize independent citizen suits for operational measures beyond what is necessary for compliance with effluent limitations. Once the alleged exceedances have been resolved and are not capable of recurrence, Count II fails for the same reason as Count I.[7] In addition,

---

federal law. *See Kendall v. Thaxton Road LLC*, 2013 WL 210892 (N.D. Ga. Jan. 18, 2013); *Parris v. 3M Company*, 595 F.Supp.3d 1288 (N.D. Ga. 2022). However, this Court is not bound to follow a decision issued by a fellow district court judge that has never been addressed by the Eleventh Circuit. *See Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co., Ltd*., 240 F.3d 956, 965 (11th Cir. 2001).

[7] To the extent Count II is based on exceedances of the Parameters in Compliance, Count II fails as a matter of law. To the extent Count II is based on exceedances of ammonia and phosphorus, those claims will be rendered moot once the second Consent Order is finalized and executed.

claims related to the duty to mitigate and duty to prevent downstream injury fail for lack of notice and because the allegations are conclusory and speculative.

### A.   The CWA Does Not Authorize Citizen Suits for Operational Measures Beyond What Is Necessary for Compliance.

Citizens can only seek remedies for violations of "an effluent standard or limitation under this chapter" or "an order issued by the Administrator or a State with respect to such a standard or limitation.'" 33 U.S.C. § 1365(a)(1); *see Davis v. Cate*, 2024 WL 3373512, at *6 (S.D. Ga. Mar. 26, 2024). "The definition of 'effluent standard or limitation under this chapter' includes federally mandated standards or limits and NPDES permit terms." *Culbertson v. Coats Am., Inc.*, 913 F. Supp. 1572, 1582 (N.D. Ga. 1995). Under the CWA, "remedial measures" must be attached to "actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard." 33 U.S.C. § 1362(17). The definition of "effluent standard or limitation" is not so expansive as to include *any* desirable operational measures if compliance with the effluent limitations has been achieved by other means, as the CRK apparently contends. *See Culbertson*, 913 F. Supp. at 1582 (finding that "[t]he definition [of 'effluent limitations and standards'] does not include specific studies and related upgrade proposals initially mandated under an administrative order because compliance with effluent permit terms was achieved by other means); *see also S. River Watershed All., Inc. v. DeKalb Cnty.,*

*Georgia*, 484 F. Supp. 3d 1353,1371, *aff'd*, 69 F.4th 809 (11th Cir. 2023).[8]

Here, the narrative conditions in Part II of the Permit identified by CRK are intrinsically linked to compliance with effluent limitations outlined in Part I. The language of the Permit underscores this connection: "The permittee shall properly maintain and operate efficiently all treatment or control facilities and related equipment installed or used by the permittee to achieve compliance with this permit…. Back-up or auxiliary facilities or similar systems shall be operated only when necessary to achieve permit compliance."). (*See* Porter Decl. Exs. A & B.)

As a result, these narrative conditions do not give rise to an independent CWA claim and must be dismissed.[9]

### B.    Claims for Duty to Mitigate and Prevent Downstream Injury Fail for Lack of Notice and Are Premised on Conclusory Allegations.

### 1.    CRK Failed to Issue Proper Notice.

"[T]he 60-day notice requirement of 33 U.S.C. § 1365(b) is a mandatory condition precedent to the filing of a citizen suit under the CWA. If a plaintiff fails

---

[8] CRK's suggestion that the City negligently operated or maintained its facilities does not amount to an allegation that the City violated an effluent standard. *See Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397–98 (5th Cir. 1985).

[9] CRK's attempt to assert CWA claims based on all three narrative conditions fails as a matter of law because they do not amount to effluent violations. Even if the narrative condition requiring "Proper Operation and Maintenance" could survive (which it cannot), certainly the narrative conditions imposing a duty to mitigate and a duty to prevent injury downstream do not amount to effluent violations.

to comply with this notice requirement where it is applicable, the district court is required to dismiss the action." *National Environmental Foundation v. ABC Rail Corp.*, 926 F.2d 1096, 1097 (11th Cir. 1991).  This notice serves two functions.  First, it provides the alleged violator an opportunity to investigate, take corrective actions, and return to compliance to avoid a lawsuit.  *Id.*  Second, it provides EPD an opportunity to bring an enforcement action.  *See Gwaltney,* 484 U.S. at 59.

Here, CRK's Notice Letter is insufficient as to the allegations in Count II of regarding Parts II.A.10 and II.A.11 of the Permit because the Notice Letter does not cite to or allege specific violations of either condition.  (*See* Dkt 1-1, *generally*.) CRK raises these purported permit violations for the first time its Complaint, and as such, the Notice Letter was deficient.  S*ee New Manchester Resort & Golf, LLC v. Douglasville Dev., LLC*, 734 F. Supp. 2d 1326, 1335 (N.D. Ga. 2010) (finding insufficient notice where plaintiff's complaint alleged defendants violated permit conditions by ignoring monitoring and reporting requirements but intent to sue letter did "not say anything about monitoring and reporting requirements").

### 2.    The Allegations Are Conclusory and Speculative.

CRK's allegations regarding the City's alleged violations of Parts II.A.10 and II.A.11 also fail to meet the federal pleading standard.  "Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *S. River Watershed All., Inc. v.*

*DeKalb Cnty., Georgia*, 484 F. Supp. 3d at 1364.

Here, CRK's allegations regarding the "Duty to Mitigate" (Compl. ¶¶ 88, 89) encompass two short paragraphs and merely quote the text of the Permit. CRK's allegations regarding the "Notice Provision" (*Id.* ¶¶ 90–93) fare no better. The Notice Provision requires that in the case of a spill, the City "notify EPD in person or by telephone of the location and nature of the danger," and "immediately take all reasonable and necessary steps to prevent injury to property and downstream users of said water." (*Id.* ¶ 90.) CRK does not allege a lack of notice; instead, it speculates about the potential harmful effects and risks that inadequately treated sewage "could" have on downstream users. (*Id.* ¶ 91.) These conclusory and speculative allegations, wholly unrelated to the actual requirements of the Permit, fail to state a claim for which relief can be granted.

## CONCLUSION

For the foregoing reasons, CRK's claims should be dismissed, in part, and stayed, in part, pending resolution of EPD's ongoing enforcement activities.

Respectfully submitted, this 22nd day of November, 2024.

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**

/s/ Lindsey B. Mann

Fitzgerald Veira (GA Bar No. 726726)
fitzgerald.veira@troutman.com
Lindsey B. Mann (GA Bar No. 431819)
lindsey.mann@troutman.com
Kadeisha West (GA Bar No. 640699)
kadeisha.west@troutman.com
Anaid Reyes-Kipp (GA Bar No. 703283)
anaid.reyes-kipp@troutman.com
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
404-885-3000

Brooks M. Smith (*pro hac vice*)
brooks.smith@troutman.com
1001 Haxall Point, Suite 1500
Richmond, Virginia 23219
804-697-1200

*Counsel for City of Atlanta, Georgia*

## FONT CERTIFICATION

Counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1(B).

This 22nd day of November, 2024.

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

/s/ Lindsey B. Mann

Lindsey B. Mann (GA Bar No. 431819)
lindsey.mann@troutman.com

*Counsel for City of Atlanta, Georgia*

## CERTIFICATE OF SERVICE

I hereby certify that the within and foregoing *Memorandum of Law in Support of Motion to Dismiss in Part and Motion to Stay in Part* was served via the Court CM-ECF electronic filing system upon all Counsel of Record.

This 22nd day of November, 2024.

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

/s/ Lindsey B. Mann

Lindsey B. Mann (GA Bar No. 431819)
lindsey.mann@troutman.com

*Counsel for City of Atlanta, Georgia*